UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Daniel Vargas,  Case No. 3:21-cv-1551

   Plaintiff,

  v.  MEMORANDUM OPINION
          AND ORDER

Board of the Metropolitan Park
District of the Toledo Area,

   Defendant.

## I. INTRODUCTION

Defendant, the Board of the Metropolitan Park District of the Toledo Area ("Metroparks"), moved for summary judgment against Plaintiff Daniel Vargas. (Doc. No. 39). Vargas submitted a brief in opposition. (Doc. No. 42). Metroparks submitted a reply. (Doc. No. 43). For the reasons stated below, I grant Metroparks's motion.

## II. BACKGROUND

The dispute leading to this case began in August of 2018, when Vargas filed his first of five charges against Metroparks with the Ohio Civil Rights Commission ("OCRC"). It culminated in April of 2020, when Metroparks fired Vargas for poor work performance and for threatening his supervisor.

Vargas is Hispanic, and he has Attention Deficit Disorder (ADD). (Doc. No. 31 at 7, 95-96). After spending nearly 25 years working an array of construction and repairs jobs, Vargas was hired by Metroparks in 2014 as a grounds maintenance assistant, a seasonal position. (*Id.* at 8-11, 26; Doc. No. 31-2). Two years later, Metroparks promoted Vargas to Park Technician 1, a job Vargas

was "actively working" to get because it was full-time and eligible for union membership, which Vargas obtained.  (Doc. No. 31 at 28-29; Doc. No. 31-3).  As a Park Technician, Vargas performed physical labor maintaining the grounds, facilities, and equipment at his assigned park.  (Doc. No. 31 at 32-33).

Trouble began for Vargas in 2017 and 2018, when he allegedly endured a string of racist incidents.  First, in November of 2017, a seasonal employee named Alan allegedly said in Vargas's presence that a work task was "like selling ice cream to a Mexican in Mexico."  (Doc. No. 31-4 at 3).  A few months later, in April of 2018, another seasonal worker named Troy made a comment to the effect that Vargas should not fly a Mexican flag or wear a Mexico hoodie because Vargas lived in the United States.  (Doc. No. 31 at 42-43).  Vargas says other staff members, including his supervisor, Steve Stockford, took no action to remedy this harassment, and further, that Stockford retaliated against him by threatening to discipline him for unrelated incidents.  (Doc. No. 31-4 at 3).  Vargas filed a complaint with the OCRC about this matter on August 9, 2018 ("First OCRC Complaint"), which he subsequently withdrew after he and Metroparks reached a settlement.  ("2018 Settlement Agreement").  (*See id.*; Doc. No. 31-6).

Vargas also alleges that in early 2018, Joe Fausnaugh, the Chief of Operations for Metroparks and a friend of Stockford's, told Vargas he should "just wear a sombrero" if Vargas wanted additional sun protection while operating a lawnmower.  (Doc. No. 31 at 51-52; Doc. No. 38 at 2)).  Fausnaugh denies he made this comment.  (Doc. No. 38 at 17-18).  Vargas asserts this incident occurred before he filed his First OCRC Complaint, though the First OCRC Complaint does not refer to it.  (*See* Doc. No. 31 at 14; Doc. No. 31-4 at 3-6).

 Relations between Vargas and Stockford did not improve following the resolution of the First OCRC Complaint.  After Vargas injured his right arm in February of 2019 and was placed on light work duty, Stockford issued Vargas a verbal warning for allegedly lying to Stockford about the

reason Vargas did not finish washing flower pots and because Vargas performed additional work salting the sidewalks, which was supposedly outside of his light work duty restrictions. (Doc. No. 31 at 82-86; Doc. No. 31-12 at 3). Vargas was also required to attend a Pre-Disciplinary Meeting related to these incidents. (Doc. No. 34-1 at 3). A Pre-Disciplinary Meeting is a hearing to discuss a bargaining-unit employee's alleged misconduct, and it is a prerequisite to imposing formal discipline. (*See* Doc. No. 32-6 at 46). On March 29, 2019, Vargas filed his second OCRC charge, alleging Stockford discriminated against him on the basis of disability and retaliated against him for filing his First OCRC Charge ("Second OCRC Charge").[1] (Doc. No. 31-9).

Later in 2019, Vargas alleges Stockford disciplined him following the second of two incidents. In the first, Vargas purchased oil-based polyurethane for a project after being asked to purchase water-based polyurethane, and Stockford met with Vargas to discuss it. (Doc. No 31 at 90-93, Doc. No. 34-2 at 2). In the second, after Vargas mowed the wrong section of the Toledo Botanical Gardens, Stockford allegedly yelled at Vargas and gave him a verbal warning. (*Id.* at 93-94). On August 9, 2019, Vargas filed his third OCRC charge, alleging Stockford discriminated against him on the basis of race and disability and retaliated against him for his previous two OCRC Charges ("Third OCRC Charge"). (Doc. No. 31-11 at 3-4).

Throughout 2019, Vargas participated in the Employee-Driven Incentive Pay Program ("Pay Program"), which gives bargaining-unit Metroparks employees a pathway for earning an additional pay increase if they perform well. (*See* Doc. No. 32-6 at 69-70). As part of the year-end performance evaluation for this program, Stockford determined that Vargas met expectations in only 4 of 10 categories and fell below expectations in the remaining 6. (Doc. No. 32-14 at 5). As a

---

[1] The disability Vargas refers to in his Second OCRC Charge is his arm injury, not his ADD. (*See* Doc. No. 31-9 at 1). Vargas was not diagnosed with ADD until August of 2019, after the events leading to Vargas's first three OCRC charges. (*See* Doc. No. 31 at 25). In this lawsuit, Vargas claims Metroparks discriminated against him based on his ADD and not any other disability. (*See* Doc. No. 42 at 25-26; Doc. No. 31 at 40, 43).

result, Vargas was placed on an Employee Development Action Plan ("Action Plan"), a tailored 60-day plan that required Vargas to show improvement in 8 areas or risk "discipline up to and including termination." (Doc. No. 31-14 at 2). Because of this, on January 29, 2020, Vargas filed his fourth OCRC charge, alleging he was denied a pay raise and was placed on the Action Plan in retaliation for filing his three previous charges ("Fourth OCRC Charge"). (Doc. No. 31-13 at 3).

At the conclusion of the performance improvement period, Metroparks evaluated Vargas in each of the 8 areas in his Action Plan and found he had failed to make the necessary improvements in 5 of them. (*See* Doc. No. 31-15 at 1-2). On Friday, April 23, 2020, Vargas and three of his union representatives met with Stockford, Fausnaugh, and Matt Cleland, the Metroparks Treasurer and Deputy Director, to discuss these results. (Doc. No. 31 at 37; Doc. No. 38 at 3; Doc. No. 32-1 at 1). Stockford reported to Fausnaugh, and Fausnaugh reported to Cleland. (*See* Doc. No. 38 at 2-3). Vargas was not terminated during that meeting, and the parties agree that Metroparks did not plan to terminate Vargas at that time. (*See* Doc. No. 43 at 10-11; Doc. No. 42 at 17).

After the Metroparks personnel left the meeting room, Vargas stayed behind with his union representatives to discuss his case. (Doc. No. 31 at 35). In response to a question from one of them, Vargas said something to the effect of: "if I get terminated, Steve will need security." (*See id.*; Doc. No. 42 at 17-18). Vargas does not dispute that he said this or that "Steve" referred to Stockford, but he asserts it was meant as a joke and that the union representatives perceived it as one. (*See id.*). Later that day, however, Mike Elton, one of the union representatives present for Vargas's comment, reported to Fausnaugh that Vargas had made a serious threat against Stockford. (Doc. No. 38 at 3). Fausnaugh then reported this to Cleland. (*Id.*; Doc. No. 32-4 at 3). Cleland immediately placed Vargas on administrative leave and scheduled another Pre-Disciplinary Meeting for the following Monday, April 27, 2020. (Doc. No. 31-19 at 1-2). At the conclusion of that meeting, Cleland terminated Vargas. (*Id.* at 3; Doc. No. 32-4 at 4).

On May 14, 2020, Vargas filed his fifth OCRC charge, alleging he was terminated because of his race, because of his disability, and in retaliation for filing his previous four OCRC charges ("Fifth OCRC Charge").  (Doc. No. 18 at 2, 5).  He also reiterated his allegations of harassment based on race and national origin.  (*Id.* at 4).  Vargas received his right-to-sue letter for his Fifth OCRC Charge on May 12, 2021, and on August 9, 2021, he filed suit in this court.  (Doc. No. 12-2; Doc. No. 1).

### III.    STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the initial responsibility of "informing the district court of the basis for its motion, and identifying those portions of 'the [record] . . . ,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant may meet this burden by demonstrating the absence of evidence supporting one or more essential elements of the non-movant's claim.  *Id.* at 323-25.

Once the movant meets this burden, the opposing party "must set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations.  It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, Rule 56(e) "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position.  *Celotex*, 477 U.S. at 324; *see also Harris v. Gen. Motors Corp.*, 201 F.3d 800, 802 (6th Cir. 2000).  Summary judgment must be entered "against a party who fails to make a showing sufficient to

establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

"In considering a motion for summary judgment, the Court must view the facts and draw all reasonable inferences therefrom in a light most favorable to the nonmoving party." *Williams v. Belknap*, 154 F. Supp. 2d 1069, 1071 (E.D. Mich. 2001) (citing *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987)). But "'at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter.'" *Wiley v. United States*, 20 F.3d 222, 227 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 249). Therefore, "[t]he Court is not required or permitted . . . to judge the evidence or make findings of fact." *Williams*, 154 F. Supp. 2d at 1071. The purpose of summary judgment "is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried." *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 130 F. Supp. 2d 928, 930 (S.D. Ohio 1999). Ultimately, I must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52; *see also Atchley v. RK Co.*, 224 F.3d 537, 539 (6th Cir. 2000).

## IV. ANALYSIS

Vargas's amended complaint contains six claims: (1) discrimination and harassment on the basis of race and national origin under Title VII; (2) discrimination and harassment on the basis of race and national origin under Ohio law; (3) retaliation under Title VII; (4) retaliation under Ohio law; (5) discrimination on the basis of disability in violation of the ADA; and (6) discrimination on the basis of disability in violation of Ohio law. (Doc. No. 12 at 5-13). Metroparks seeks summary judgment on all of them. (*See* Doc. No. 39-1).

## A.    EFFECT OF 2018 SETTLEMENT AGREEMENT

The parties disagree, first, over the scope and effect of the 2018 Settlement Agreement that resolved Vargas's First OCRC Charge.  Metroparks argues that Vargas "waived any claims or allegations related to the comments which pre-dated the 2018 Settlement Agreement."  (Doc. No. 39-1 at 32).  Specifically, Metroparks contends that the "waiver and release includes Plaintiff's allegations related to comments pre-dating the Agreement by seasonal employees 'Troy' and 'Alan,' Plaintiff's allegation that Fausnaugh made a comment to the effect of 'just wear a sombrero,' and Metroparks' follow-up and response to those allegations."  (Doc. No. 43 at 6).

In his opposition, Vargas does not rely on the alleged comments made by "Troy" or "Alan," and he concedes that comments made prior to the 2018 Settlement Agreement cannot be used "for direct evidence of discrimination" because "the discrimination claim pertaining to that time period has been released."  (Doc. No. 42 at 20 n.3).  But, he argues that the "sombrero" comment can be used to show Fausnaugh harbored "discriminatory animus" toward Vargas when Fausnaugh participated in Vargas's termination process in 2020, even if the comment is not itself direct evidence of discrimination for his current claims.  (*Id.* at 18 n.2).

Courts examine an employee's written agreement to waive or release anti-discrimination rights "'under normal contract principles.'"  *Sako v. Ohio Dept. of Admin. Servs.*, 278 F. App'x 514, 517 (6th Cir. 2008) (quoting *Shaheen v. B.F. Goodrich Co.*, 873 F.2d 105, 107 (6th Cir. 1989)).  "The scope of a release, like any contract, depends on ascertaining the intent of the parties at the time of signing the release." *Adams v. Philip Morris, Inc.*, 67 F.3d 580, 585 (6th Cir. 1995).  Intent is determined by "the language of the entire instrument and all surrounding facts and circumstances under which the parties acted in light of the applicable law as to employment discrimination at the time." *Id.*  But, "[i]t is the general rule in this circuit that an employee may not prospectively waive his or her rights" under anti-discrimination laws like Title VII and the ADA. *Id.* at 584.

7

Under the 2018 Settlement Agreement, Vargas "agree[d] to waive, release, and . . . not to sue Respondent for any claims arising before the Ohio Civil Rights Commission that were the subject of the above referenced charge." (Doc. No. 31-6 at 1). The "above-referenced charge" is Vargas's First OCRC Charge. (*Compare id. with* Doc. No. 31-4 at 3). Two "claims . . . were the subject of the" First OCRC Charge: (1) a hostile work environment claim based on the alleged racist comments made by "Troy" and "Alan," and (2) a retaliation claim against Stockford. (*See* Doc. No. 31-4 at 3). Contrary to Metroparks's assertion, Fausnaugh's alleged "sombrero" comment does not form a basis for any claim in the First OCRC Charge because the First OCRC Charge does not mention that incident. (*See* Doc. No. 31-4 at 3-6). At the very least, given that waivers of an employee's prospective anti-discrimination rights are disfavored in this circuit, the 2018 Settlement Agreement did not waive Vargas's right to use alleged conduct not mentioned in the 2018 Settlement Agreement to show a decisionmaker's future intent a year and a half later.

I conclude the 2018 Settlement Agreement does not preclude Vargas from using the "sombrero" comment to attempt to demonstrate Fausnaugh's alleged discriminatory animus during the 2020 termination process.

## B.    RACE AND NATIONAL ORIGIN DISCRIMINATION CLAIMS[2]

Metroparks argues Vargas cannot show any direct evidence of race or national-origin discrimination and cannot make out a prima facie case under the *McDonnell Douglas* burden-shifting framework. (Doc. No. 39-1 at 28). Metroparks further argues that even if Vargas can establish a prima facie case, Vargas's threat combined with his poor job performance is a legitimate, non-

---

[2]  The next two sections apply the law of Title VII to Vargas's federal and state race, national origin discrimination, and retaliation claims. "[F]ederal case law applying Title VII is generally applicable to cases involving § 4112 of the Ohio Civil Rights Act." *Birch v. Cuyahoga Cnty. Prob. Ct.*, 392 F.3d 151, 163 (6th Cir. 2004) (citing *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n*, 421 N.E.2d 128, 131-32 (Ohio 1981)).

discriminatory reason for terminating him, and Vargas cannot demonstrate that this reason is pretextual.  (*Id.* at 29-31).

Vargas concedes there is no direct evidence of discrimination in this case.  (Doc. No. 42 at 14).  But he argues he has made out his prima facie case and that even if Metroparks has articulated a legitimate, non-discriminatory reason for firing him, this reason is pretextual because Fausnaugh, who possesses discriminatory animus against Vargas, was involved in his termination.  (Doc. No. 42 at 14-18).  In the alternative, Vargas argues his race discrimination claims survive under a "mixed motive" analysis because of Fausnaugh's discriminatory animus.  (*Id.* at 13-15).

1.     ***McDonnell Douglas***

Title VII of the Civil Rights Act of 1964 makes it an "unlawful employment practice" to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . or national origin."  42 U.S.C. § 2000e-2(a)(1).  A plaintiff may show an employer's discriminatory treatment through direct evidence or circumstantial evidence.  *Johnson v. Kroger Co.*, 319 F.3d 858, 864-65 (6th Cir. 2003).  "Title VII claims based on circumstantial evidence of discrimination are analyzed under the familiar three-step framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)."  *Briggs v. Univ. of Cincinnati*, 11 F.4th 498, 508 (6th Cir. 2021).

Under the first step of this framework, the plaintiff has the initial burden of establishing a prima facie case of discrimination by demonstrating that "(1) he or she was a member of a protected class; (2) he or she suffered an adverse employment action; (3) he or she was qualified for the position; and (4) he or she was replaced by someone outside the protected class or was treated differently than similarly-situated, non-protected employees."  *Id.* (internal citation and quotation marks omitted).

Then, the burden shifts to the defendant to articulate a "legitimate, non-discriminatory reason for its actions, supported by admissible evidence that 'if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action.'" *Id.* (quoting *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707 (6th Cir. 2006)) (internal citation omitted).

Finally, the burden shifts back to the plaintiff, who must "prove by a preponderance of the evidence that the employer's proffered reasons were a mere pretext for discrimination." *Briggs*, 11 F.4th at 508. (citing *Wright*, 455 F.3d at 707-08). A plaintiff can establish pretext by showing that the proffered reason: "(1) had no basis in fact; (2) was insufficient motivation for the employment action; or (3) did not actually motivate the adverse employment action." *Briggs*, 11 F.4th at 515 (internal quotation omitted). At this third stage, the plaintiff "need not present independent evidence that the proffered reason is pretext for [ ] discrimination," but "he must come forward with evidence that the defendant's reason for the employment action is false," *Sutherland v. Michigan Dep't of Treasury*, 344 F.3d 603, 615 (6th Cir. 2003) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000)). At the pretext stage, the "ultimate inquiry" is: "did the employer fire the employee for the stated reason or not?" *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012).

To survive a motion for summary judgment, there must be "sufficient evidence to create a genuine dispute at each stage of the *McDonnell Douglas* inquiry." *Risch v. Royal Oak Police Dep't*, 581 F.3d 383, 390-91 (6th Cir. 2009) (quoting *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 524 (6th Cir. 2007)). "The employer bears the burden of production at the second step, but the employee bears the ultimate burden of production and persuasion." *Briggs*, 11 F.4th at 509 (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507-08 (1993)). Here, "[t]here is no need to determine whether [the plaintiff] established" a prima facie case of discrimination "because he cannot discredit" Metroparks's reason for firing him. *Pierce v. General Motors LLC*, 716 F. App'x 515, 517 (6th Cir. 2017) (citing *Cline v. BWXT Y-12 LLC*, 521 F.3d 507, 509 (6th Cir. 2008)).

Metroparks has articulated a legitimate, non-discriminatory reason for firing Vargas: the combined effect of his poor job performance and his threat against Stockford, his supervisor.  *See Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 546 (6th Cir. 2008) ("[p]oor performance is a legitimate, nondiscriminatory reason for terminating a person's employment"); *Smith v. Leggett Wire Co.*, 220 F.3d 752, 759 (6th Cir. 2000) (threat of physical violence is a legitimate, non-discriminatory reason for firing an employee).  The Metroparks employee handbook prohibits violent and threatening behavior as well as unsatisfactory work performance.  (Doc. No. 32-5 at 10, 13).  The Collective Bargaining Agreement permits employees to be "disciplined for just cause."  (Doc. No. 32-6 at 10).

Vargas does not argue otherwise, though he does assert that "only the alleged threat could potentially be a basis for Mr. Vargas's termination," since Metroparks admittedly had no plans to fire Vargas prior to the threat.  (Doc. No. 42 at 17).  But Metroparks does not assert it fired Vargas because of the threat alone.  Instead, it urges, Vargas performed his job poorly, and the threat against Stockford was the last straw.  (Doc. No. 43 at 13).

Vargas nevertheless argues that this reason is pretextual because it has "no basis in fact" and was "insufficient to motivate his termination."  (Doc. No. 42 at 17).  He offers two potential paths to finding pretext.  First, he says, his "comment was a joke," and since his performance issues alone were not enough to terminate him, Metroparks's reliance on his supposed threat is pretextual.  (*Id.*)  Second, Vargas asserts that the "sombrero" comment shows Fausnaugh harbored discriminatory animus against him, and that Fausnaugh's involvement in his termination process therefore infected the entire proceedings with an impermissible discriminatory motivation.  (*Id.*).

The "honest belief" rule defeats Vargas's first argument.  "When an employer reasonably and honestly relies on particularized facts in making an employment decision, it is entitled to summary judgment on pretext."  *Chen v. Dow Chem. Co.*, 580 F.3d 394, 401 (6th Cir. 2009).  Vargas

does not contest that he had performance issues or that Cleland, who ultimately fired Vargas, honestly and reasonably believed that he did.  (*See* Doc. No. 42 at 12).  Vargas himself admits to making a number of specific mistakes on the job, such as purchasing stone from the wrong store; purchasing the wrong type of polyurethane product; mowing the wrong section of the Toledo Botanical Garden lawn; and repeatedly showing up late to work.  (Doc. No. 31 at 14, 24-25, 27).

Further, in the written evaluation section submitted as part of the voluntary Improvement Program, Stockford lists and describes nearly two dozen specific incidents (including alleged dates, times, and places) where Vargas allegedly did not meet his job expectations.  (*See* Doc. No. 32-14 at 8-23).  During the April 23, 2020 Pre-Disciplinary Meeting to discuss Vargas's performance while on his Action Plan, Cleland, who ultimately made the decision to fire Vargas, stated that Vargas was not meeting the minimum standards for his position because he had failed to improve in 5 of the 8 categories on his Action Plan.  Vargas does not point to any record evidence rebutting the conclusion he was not meeting the minimum standards for his position at the close of the Action Plan.  (*See* Doc. No. 42 at 12, 15-16, 19-20, 22).

Further, while Vargas testified the union representatives who heard him make the comment "all laughed about it," the union representatives are not the audience that matters.  (Doc. No. 31 at 35).  Rather, the question is whether decisionmakers at *Metroparks* "reasonably and honestly" perceived the comment as a threat in relying on it to terminate Vargas.  *Chen*, 580 F.3d at 401.

Metroparks has pointed to uncontroverted record evidence that this is what happened. (Doc. No. 39-1 at 18-19).  Vargas's testimony confirms that Stockford, Fausnaugh, and Cleland were not in the room when Vargas said, "if I get terminated, Steve will need security."  (Doc. No. 31 at 35).  Elton, one of Vargas's union representatives at the Friday, April 23, 2020 meeting, reported the comment to Fausnaugh as a "serious threat" against Stockford.  (Doc. No. 38 at 3).  Fausnaugh reported this to Cleland, his boss.  (*See id.*; Doc. No. 32-4 at 3).  Immediately afterwards, Vargas was

escorted off Metroparks property.  (Doc. No. 31 at 36).  Later that day, Cleland placed Vargas on administrative leave and scheduled a meeting on Monday, April 27 – the next work day – to discuss the incident.  (Doc. No. 31-19 at 1-2).  Cleland fired Vargas at the conclusion of that final meeting. (*See id.* at 3).

That Elton reported the comment as a serious threat against Stockford gave Cleland "good reason to believe" it was credible.  *Pierce*, 716 F. App'x at 518.  Further, Cleland's swiftness in removing Vargas from the property, placing him on administrative leave, and scheduling a follow-up disciplinary meeting show that Cleland took the threat seriously at the time.  Vargas's comment about Stockford therefore "counts as a factual basis for a decision, not as a pretext for that decision." *Id.*

Vargas's second argument boils down to a "rubber stamp" or "cat's paw" theory of liability, and it, too, fails.  He argues there is a "material question of fact" regarding whether Fausnaugh, who harbored discriminatory animus toward Vargas, influenced Cleland's decision to fire Vargas.  (Doc. No. 42 at 18).  He further asserts that Fausnaugh's "discriminatory animus is imputed to the rest of the decisionmakers," which, he says, raises a genuine dispute of material fact over whether Vargas was fired because of his threat or because Fausnaugh manipulated Cleland into firing Vargas for discriminatory reasons.  (*Id.*).

An employer can be liable under a cat's paw theory of liability where a non-decisionmaker who harbors discriminatory animus towards an employee "uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action."  *Marshall v. The Rawlings Co., LLC*, 854 F.3d 368, 377 (6th Cir. 2017) (quoting *EEOC v. BCI Coca-Cola Bottling Co. of Los Angeles*, 450 F.3d 476, 484 (10th Cir. 2006) (internal quotation marks omitted)).  To show unlawful discrimination, a plaintiff must offer "evidence of a 'causal nexus' between the ultimate decisionmaker's decision to [discipline] the plaintiff and the supervisor's discriminatory animus."

13

*Chattman v. Toho Tenax America, Inc.*, 686 F.3d 339, 350 (6th Cir. 2012) (quoting *Madden v. Chattanooga City Wide Serv. Dep't*, 549 F.3d 666, 677 (6th Cir. 2008)).  This requires Vargas to show: (1) Fausnaugh committed an animus-inflected act "'intended ... to cause an adverse employment action'" and (2) the "discriminatory action 'is a proximate cause of the ultimate employment action.'"  *Id.* at 351 (quoting *Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011)) (emphasis removed).

Vargas identifies one act of discriminatory animus by Fausnaugh: the "sombrero" comment from 2018.  (Doc. No. 42 at 17); *see DeNoma v. Hamilton Cnty. Ct. of Common Pleas*, 626 F. App'x 101, 106 (6th Cir. 2015) (applying the requirement that the plaintiff identify "*an act* intended to cause" the adverse employment action) (emphasis added).  Viewing the record in the light most favorable to Vargas requires assuming that Fausnaugh did make this demeaning and discriminatory comment. But even if this remark shows Fausnaugh's discriminatory animus and intent to cause an adverse employment action in 2018, this comment does not show that discriminatory animus "[was] a proximate cause" of Vargas's termination by Cleland in 2020.  *Staub*, 562 U.S. at 422.

First, the two-year gap between Fausnaugh's comment and Vargas's termination is "longer than the usual span of time that can support an inference of causation" in employment discrimination cases.  *Shazor v. Professional Transit Mgmt., Ltd.*, 744 F.3d 948, 956 (6th Cir. 2014) (discussing a one-year gap between the sending of sexist emails and an adverse employment action); *see also Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 274 (2001) (explaining, in the retaliation context, that "[a]ction taken . . . 20 months later suggests, by itself, no causality at all").

Second, even if Vargas could sidestep the temporal proximity issue, he has not identified where in the decision-making process Fausnaugh's "sombrero" comment, or the animus it evinces, might have influenced Cleland.  "Cat's paw" liability attaches where a non-decisionmaker uses an employer's legitimate disciplinary machinery to achieve illegitimate discriminatory ends by submitting a "biased recommendation" up the chain of command.  *Liebau v. Dykema Gossett, PLLC*,

Case No. 21-cv-11823, 2023 WL 2330402 at *8-9 (E.D. Mich., March 2, 2023) (quoting *Marshall*, 854 F.3d at 379-80). To make this showing, a plaintiff can demonstrate that the ultimate decisionmaker "deferred to [the] opinion" of the biased supervisor or that the ultimate decisionmaker relied on a biased supervisor's "selective" reporting of misconduct. *Bledsoe*, 42 F.4th at 582 (plaintiff established "cat's paw" liability where decision-making committee deferred to a biased supervisor's opinion of and knowledge about the plaintiff); *Madden*, 549 F.3d at 677-78 (evidence of supervisor's selective reporting of misconduct by Black employee established "cat's paw" liability).

Vargas has shown neither. He points to no record evidence that Fausnaugh "misinformed" or "selectively informed" Cleland about Vargas's threat. *Chattman*, 686 F.3d at 353; (*see* Doc. No. 42 at 17-18). Further, unlike cases where an employer terminates an employee based on a performance evaluation by a biased supervisor, Vargas has pointed to no record evidence that Fausnaugh evaluated Vargas or recommended he be terminated, either before or after the threat against Stockford. *Cf., e.g., Bishop v. Ohio Dep't of Rehab. and Corr.*, 529 F. App'x 685, 696-97 (6th Cir. 2013) (reliance on a biased supervisor's negative performance evaluation established "cat's paw" liability at summary judgment). True, a negative performance evaluation paved the way for Vargas's placement on the Action Plan. But Stockford, not Fausnaugh, authored that evaluation, and Vargas does not argue that Stockford held discriminatory animus toward Vargas. (*See* Doc. No. 42 at 17-18) (identifying only Fausnaugh as the "individual with discriminatory animus").

As for the comment that Stockford "will need security," Vargas admits he said this, and the unrebutted record evidence shows Elton reported it to Metroparks as a "serious threat." (*See* Doc. No. 32-4 at 3, Doc. No. 38 at 3). Vargas identifies no evidence suggesting Fausnaugh misrepresented Elton's report to Cleland or even that Fausnaugh recommended Cleland fire Vargas because of the comment. (Doc. No. 42 at 17; Doc. No. 38 at 2). The most he can offer is that Fausnaugh was vaguely "involved in the disciplinary meeting" and that two years before, he directed

a demeaning and discriminatory comment at Vargas.  (Doc. No. 42 at 17).  This is not enough to establish a causal nexus between Fausnaugh's discriminatory animus and Cleland's post-threat decision to fire Vargas.

**2.**     **Mixed Motive**

Title VII also makes it unlawful for an employer to use race or national origin as a "motivating factor for any employment practice, even though other factors also motivated the practice."  42 U.S.C. § 2000e-2(m).  When a defendant challenges a "mixed motive" claim at summary judgment, a plaintiff must "produce evidence sufficient to convince a jury that: (1) the defendant took an adverse employment action against the plaintiff; and (2) 'race, color, religion, sex, or national origin was a motivating factor' for the defendant's adverse employment action.  *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 400 (6th Cir. 2008) (quoting 42 U.S.C. § 2000e-2(m)).

This framework applies "regardless of the type of proof presented by the plaintiff."  *Id.*  "To determine whether discriminatory comments motivated an adverse employment action, [a] court may consider factors such as the identity of the speaker, the nature and substance of the comments, and the temporal connection of the comments to the challenged decision."  *Lawson v. United States Steel Corp.*, No. 19-cv-13175, 2022 WL 17960778 at *4 (E.D. Mich. 2022) (citing *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 354-57 (6th Cir. 1998)).

Here, the parties dispute whether race or national origin was a "motivating factor" in Vargas's termination.  (Doc. No. 42 at 18-20; Doc. No. 43 at 18-19).  But in his brief, Vargas only repeats the same unsuccessful arguments he made about pretext.  (Doc. No. 42 at 20).  He asserts that because Fausnaugh made the "sombrero" comment in 2018, and because Fausnaugh was "involved in the disciplinary meeting," his "discriminatory animus is imputed to the rest of the decisionmakers."  (*Id.*).  This is not enough to show mixed motive.

16

First, the two-year gap between the "sombrero" comment and Vargas's termination attenuates any temporal link between Fausnaugh's animus and the firing. *See Lawson*, 2022 WL 17960778 at *9 (explaining that the plaintiff "had not shown a temporal connection" where the gap was six months).

Second, Vargas does not dispute that Cleland, rather than Fausnaugh, made the termination decision. (*See* Doc. No. 42 at 17-18, 20). While Fausnaugh was physically present during at least one of Vargas's Pre-Disciplinary Meetings, Vargas points to no facts indicating Fausnaugh was "in a position to influence the alleged decision" or that he attempted to do so. *Ercegovich*, 154 F.3d at 355. Unlike the supervisor in *Ercegovich*, Fausnaugh did not oversee Cleland and was not "in a position to shape [Cleland's] attitudes, policies, and decisions." *Id.; see* (Doc. No. 38 at 2-3). Further, the undisputed record evidence indicates that beyond informing Cleland of Vargas's comment about Stockford, Fausnaugh played little, if any, role in the ultimate termination decision. (*See* Doc. No. 38 at 3; Doc. No. 32-4 at 3; Doc. No. 31-19). A "reasonable jury viewing the evidence as a whole" could not reach the conclusion that discriminatory animus was a motive for Vargas's termination. *Ercegovich*, 154 F.3d at 354.

Because Vargas has failed to demonstrate a genuine dispute of material fact and Metroparks is entitled to judgment as a matter of law, I dismiss Vargas's federal and state race discrimination claims.[3]

---

[3] In response to Metroparks's argument that Vargas cannot establish a prima facie case for his race- and national origin-based hostile work environment claims, Vargas insists that "racially charged *conduct*" consisting of "repeated discipline, and demeaning treatment by Defendant" created a hostile work environment. (Doc. No. 42 at 15) (emphasis original). But Vargas does not "set forth specific facts showing that there is a genuine issue for trial" by citing to the record or even by referring to specific alleged events. *Anderson*, 477 U.S. at 250 (quoting Fed. R. Civ. P. 56(e)). So, he has failed to carry his burden with respect to this claim. *See Celotex*, 477 U.S. at 322.

### C.    RETALIATION

Title VII also prohibits employers from retaliating against employees for filing complaints of discrimination.  42 U.S.C. § 2000e-3(a).  Claims for retaliation based on circumstantial evidence, like the ones in this case, are analyzed under a three-part burden-shifting framework similar to *McDonnell Douglas. Briggs*, 11 F.4th at 514.  To establish a prima facie case of retaliation, a plaintiff must show: (1) he "engaged in a protected activity"; (2) his "exercise of such protected activity was known by the defendant"; (3) the defendant subsequently "took an action that was 'materially adverse' to the plaintiff"; and (4) "a causal connection existed between the protected activity and the materially adverse action." *Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 775 (6th Cir. 2018) (quoting *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014)).

Once a plaintiff makes out a prima facie case of retaliation, the defendant must articulate "a legitimate, non-discriminatory reason" for the adverse employment action.  *Briggs*, 11 F.4th at 515 (citing *Rogers*, 897 F.3d at 777).  If a defendant does so, the burden shifts back to the plaintiff to "demonstrate that the proffered reason is 'actually a pretext to hide unlawful retaliation.'" *Id.* (internal citation omitted).  A plaintiff can establish pretext "'by showing that the proffered reason[ ] (1) had no basis in fact; (2) was insufficient motivation for the employment action; or (3) did not actually motivate the adverse employment action.'" *Id.* (quoting *Joostberns v. United Parcel Servs., Inc.*, 166 F. App'x 783, 790–91 (6th Cir. 2006)).

Metroparks argues that Vargas's "personal beliefs or speculation are insufficient to meet his burden to show pretext."  (Doc. No. 39-1 at 37).  Vargas argues that the close temporal proximity of his Fourth OCRC Charge and his termination, coupled with the supposed flimsiness of Metroparks's proffered reason for firing him, makes it more likely than not that Metroparks retaliated against him for filing the complaint.  (Doc. No. 42 at 19-20).

As I explained above, Metroparks's proffered reason for firing Vargas is far from flimsy. The record evidence shows that Cleland, the ultimate decisionmaker, honestly and reasonably believed Vargas threatened his supervisor shortly after a meeting addressing Vargas's substantial job performance issues.  Further, Vargas points to no evidence that any discriminatory animus harbored by Fausnaugh influenced Cleland's decision.

All that is left for Vargas, then, is the temporal proximity between the filing of his Fourth OCRC Charge and his termination.[4]  But "temporal proximity cannot be the sole basis for finding pretext" in retaliation cases.  *Briggs*, 11 F.4th at 516 (quoting *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 285 (6th Cir. 2012)) (internal quotation marks omitted); *see also EEOC v. Ford Motor Co.*, 782 F.3d 753, 767 (6th Cir. 2015) (applying this rule in the ADA context).  Absent "some other, independent evidence" – Vargas identifies none – the three months between Vargas's Fourth OCRC Charge and his termination do not establish pretext.  *Seeger,* 681 F.3d at 285 (quoting *Bell v. Prefix, Inc.*, 321 F. App'x  423, 431 (6th Cir. 2009)); *cf Cooper v. City of North Olmsted*, 795 F.2d 1265, 1272 (6th Cir. 1986) ("[t]he mere fact that [the plaintiff] was discharged four months after filing a discrimination claim is insufficient to support" a causal link between her OCRC filing and her termination for purposes of the prima facie case).

Metroparks is entitled to summary judgment on Vargas's retaliation claims.

---

[4]  In response to Metroparks's argument that Vargas cannot establish a prima facie case of retaliation, Vargas suggests that Metroparks retaliated against him each time he filed an OCRC Charge because he "received discipline" within six months of each filing.  (Doc. No. 42 at 19).  But other than his termination, Vargas does not explain what "discipline" he is referring to or why it counts as an adverse employment action.  (*See id.*).  Because Vargas does not "set forth specific facts showing that there is a genuine issue for trial" as to this supposed "discipline," he has failed to carry his burden on summary judgment.  *Anderson*, 477 U.S. at 250 (quoting Fed. R. Civ. P. 56(e)).  Accordingly, I consider Vargas's retaliation arguments only as to his termination.

D.     **DISABILITY DISCRIMINATION CLAIMS**[5]

The ADA prohibits an employer from discriminating against an employee because of the

employee's disability "in regard to job application procedures, the hiring, advancement, or discharge

of employees, employee compensation, job training, and other terms, conditions, and privileges of

employment." 42 U.S.C. § 12112(a). Similar to claims advanced under Title VII, in order to

establish a prima facie case of disability discrimination, a plaintiff must show: (1) he "is a member of

a protected group," (2) he "was subject to an adverse employment decision," (3) he "was qualified

for the position," and (4) he "was replaced by a person outside of the protected class." *Thompson v.*

*Fresh Prods., LLC*, 985 F.3d 509, 522 (6th Cir. 2021).

If the plaintiff establishes a prima facie case, the employer must provide a legitimate, non-

discriminatory reason for the adverse employment action. *Id.* (citation omitted). If the employer

meets this burden of production, "the burden shifts back to the plaintiff to establish that the

proffered reason was merely pretext for unlawful discrimination." *Id.* To establish pretext, "a

plaintiff may show that the defendant's reason (1) has no basis in fact, (2) did not actually motivate

the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Id.*

(internal citations and quotation marks omitted).

In their briefing, the parties grapple over whether Vargas can show he is or was perceived to

be disabled under the first prong of the prima facie case. (*See* Doc. No. 39-1 at 32; Doc. No. 42 at

20-21). But, similar to Vargas's Title VII claims, even if Vargas could make out a prima facie case,

Metroparks has articulated a legitimate, nondiscriminatory reason for terminating Vargas, and Vargas

---

[5] This section applies the law of the ADA to Vargas's federal and state disability discrimination claims. Because the "'federal Americans with Disabilities Act [] is similar to the Ohio handicap discrimination law,'" courts can "consider the ADA and state law claims simultaneously by looking to the cases and regulations that interpret the ADA." *Talley v. Fam.s Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1104 n.3 (6th Cir. 2008) (quoting *City of Columbus Civ. Serv. Comm'n v. McGlone*, 697 N.E.2d 204, 206 (Ohio 1998)).

cannot show pretext.  *See Whitfield v. Tennessee*, 639 F.3d 253, 260 (6th Cir. 2011) (granting summary judgment in an ADA employment discrimination case where a plaintiff did not show a genuine dispute of material fact as to pretext).

As I discussed above, Metroparks's legitimate, non-discriminatory reason is the combination of Vargas's performance issues and his threat toward Stockford.  Vargas does not contest this point. (Doc. No. 42 at 27).  To show pretext, he again refers back to his pretext arguments for his race and national origin discrimination claims, which I have rejected.  (*Id.*).  And those unsuccessful arguments are even weaker in the disability discrimination context.  While Fausnaugh's "sombrero" comment is relevant to Vargas's race and national origin discrimination claims, it has nothing to do with his disability discrimination claim.  *See, e.g.*, *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 320 (6th Cir. 2012) ("[T]he ADA does not impose liability based on other forms of discrimination").

Vargas "offers practically no substantive analysis of pretext, and the record contains no evidence that could support" a finding that Metroparks fired him because of his ADD rather than because of his poor job performance and threat to harm his supervisor.  *Hrdlicka v. General Motors, LLC*, 63 F.4th 555, 569 (6th Cir. 2023); (*see* Doc. No. 42 at 26-27).  Therefore, I conclude Metroparks is entitled to summary judgment on these claims as well.

## V.    CONCLUSION

For the reasons above, I grant Metroparks's motion for summary judgment on all of Vargas's claims.  (Doc. No. 39).


So Ordered.

s/ Jeffrey J. Helmick
United States District Judge